**PHILADELPHIA & READING CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 83–823–CMW.**

United States District Court, D. Delaware.

May 31, 1990.

---

Edward B. Maxwell, II of Young, Conaway, Stargatt & Taylor, Wilmington, Del. (Frederic L. Hahn, Glen H. Kanwit and David B. Goroff of Hopkins & Sutter, Chicago, Ill., of counsel), for plaintiff.

---

William C. Carpenter, Jr., U.S. Atty. for Del., and Kent A. Jordon, Asst. U.S. Atty. for Del. (James I.K. Knapp, Acting Asst. Atty. Gen., Edward J. Snyder and Donald J. Gavin, Attys. for Tax Div., Dept. of Justice, Washington, D.C., of counsel), for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This tax refund suit now comes before this Court after a long and tedious history.[1] Plaintiff Philadelphia & Reading Corporation ("P & R") filed its complaint on November 22, 1983 to obtain a refund from the United States Internal Revenue Service (the "IRS") of approximately $10.1 million of assessed taxes plus interest and penalties.[2] After discovery had begun, the action was dismissed without prejudice by joint stipulation to provide an opportunity for the parties to resolve the interest and penalty issues.[3] P & R and the IRS ultimately reached agreement on these matters, and then jointly moved to reinstate this case on March 7, 1989. The Court granted this motion the same day. P & R later filed an amended complaint on March 28, 1989, seeking a total of $10,529,835.00 in tax refunds exclusive of interest.[4]

Both parties moved for summary judgment in May, 1989. These motions have been fully briefed and argued, and accordingly, they are presently before the Court.

The Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1).

For the reasons which will be explained herein, the Court grants the United States' motion for summary judgment and denies Philadelphia & Reading's motion for summary judgment.

## I. FACTS

Judge Marshall made findings of fact in connection with the original injunction case brought in the Northern District of Illinois in 1973. These findings of fact are presented in Judge Marshall's memorandum opinion of August 29, 1980. (Appendix A to Plaintiff's Opening Brief). The Seventh Circuit did not disturb any of Judge Marshall's findings of fact by its opinion in *Philadelphia & Reading Corp. v. Beck*, 676 F.2d 1159 (7th Cir.1982). The following constitutes the salient facts surrounding this litigation, and derives in a large part from Judge Marshall's memorandum opinion.

In the years 1970–72, the IRS conducted an extensive audit of Philadelphia Reading

---

1. Prior to filing its complaint in the District of Delaware in 1983, Philadelphia & Reading Corp. had sued the District Director of the IRS for the Chicago District in the United States District Court for the District of Illinois in late 1973. Philadelphia Reading sought to prevent the director from collecting approximately $14 million in federal income taxes. In 1980, the district court enjoined the IRS from enforcing any income tax deficiencies against Philadelphia Reading in excess of about $4 million. *See* Appendix A of Philadelphia Reading's opening brief. Both parties appealed the district court's decision to the Court of Appeals for the Seventh Circuit. The Seventh Circuit affirmed the district court's final injunction order. *See Philadelphia & Reading Corp. v. Beck*, 676 F.2d 1159 (7th Cir.1982). The parties have forwarded the record from these proceedings to this tribunal, and they are located in Volumes I and II of the Stipulated Record ("SR"). Volume III of the SR contains additional material developed during discovery in this case.

2. This amount of $10.1 million includes a tax for the taxable year ended April 18, 1968 based

on an assessment of June 22, 1973 in the amount of $1,441,159.56, together with interest in the amount of $1,025,648.22, and a penalty in the amount of $239,529.75. Complaint at ¶ 5. Also included in the $10.1 million sum is a tax for the taxable year ended December 31, 1966 based on an assessment of June 22, 1973 in the amount of $3,446,163.11, together with interest, including restricted interest, in the amount of $3,184,973.23 and a penalty in the amount of $715,238.04. Complaint at ¶ 6.

3. This dismissal occurred by the Court's order of July 9, 1985, with leave to reinstate.

4. The amount of the refund P & R now seeks totals over $30 million with interest. The amount of interest encompasses interest "unlawfully collected" and "interest on ... sums as allowed by law". Amended Complaint at ¶ 12.

The $10,529,835 represents the *total* sum of the deficiencies for the tax years in question. The original complaint sought only the *net* deficiency (the total sum of the deficiencies offset by the total sum of the overpayments) for the years in question, plus interest.

and its subsidiaries for the periods 1964–68. The principal matter in controversy was the so-called "Extoy loss" of $19 million claimed by a subsidiary of P & R in 1966. The IRS prohibited the gross amount of the loss in 1966, but allowed a part of the loss in 1967. Upon concluding its audit and review of all outstanding tax questions, the IRS declared that P & R owed certain tax deficiencies, but that P & R had also made overpayments.[5] The final calculation showed that P & R had a net tax deficiency of $4,060,184. The following represents the IRS's actual analysis of P & R's tax liability for the relevant time periods at the termination of the audit:

| Tax Period | Deficiency | Overpayment |
|---|---|---|
| 12/31/64 | | $ 231,991 |
| 12/31/65 | $ 19,485 | |
| 12/31/66 | $ 9,336,231 | |
| 12/31/67 | | $6,237,660 |
| 4/18/68 | $ 1,174,119 | |
| | | |
| Total: | $10,529,835 | $6,469,651 |
| Net Deficiency: | $ 4,060,184. | |

At this point, the Internal Revenue Code would have permitted the IRS to have served immediately upon P & R a ninety-day notice of deficiency pursuant to 26 U.S.C. § 6212. When that ninety-day period expired, the IRS then could have assessed the deficiencies and begun collection procedures with respect to the years 1965, 1966, and 1968. P & R could not have received either a refund of or credit for the overpayments until "the date on which the Secretary or his delegate first authorize[d] the scheduling of an overassessment in respect of any Internal Revenue tax [which would] be considered as the date of allowance of refund or credit in respect of such tax." 26 U.S.C. § 6407. Furthermore, because both of the overpayments exceeded $100,000, the Secretary at that time could not sanction the scheduling of the overassessments until a report was submitted to the Joint Committee on Internal Revenue

Taxation of the United States Congress and the committee had at least thirty days to express any objections. 26 U.S.C. § 6405(a). At any time before the actual scheduling of the overassessments, the IRS reserved the right to disapprove a refund or credit regardless of the Joint Committee's decision.

The practical situation that this complex statutory scheme created was that the IRS could have demanded payment of the deficiencies after the ninety-day period while P & R might have had to wait much longer for the credit of its overassessments. The IRS agent involved suggested that P & R execute a waiver form (Form 870) which would have barred the IRS from assessing and collecting any deficiencies until after P & R had received a notice of deficiency and P & R had the chance to challenge the deficiency in Tax Court. Refusal to execute the waiver would have resulted in the IRS's issuing a notice of deficiency. Philadelphia Reading would have then faced the alternatives of (1) immediately litigating the deficiency in the Tax Court, or (2) permitting the time for filing of a petition in Tax Court to lapse, so that the IRS could lawfully assess the tax deficiencies.

P & R decided not to execute a standard waiver form of restrictions on assessments and collection, Form 870. Instead, P & R executed an alternative waiver form, the qualified Form 870. The IRS specifically created this qualified form to address cases involving multi-year audits with deficiencies and overpayments. Basically, execution of this form allows a taxpayer to waive restrictions on assessment and collection for deficiency years subject to the condition precedent that the overpayment years have first been scheduled as overassessments pursuant to section 6407 of the Internal Revenue Code.[6]

---

**5.** There were several other adjustments but the Extoy loss was the dominant one. *See* Memorandum Opinion of Judge Marshall at 3.

**6.** The qualified Form 870 permits the taxpayer to maintain its right to litigate the deficiencies in the Tax Court if the IRS does not approve the

refunds, so that the waiver never actually becomes effective. If, however, the refunds are approved and scheduled, the taxpayer can rely upon its refunds to pay its deficiencies, because assessments technically cannot take effect until the refunds are available for this purpose.

P & R signed the qualified Form 870 on December 13, 1972, and it contained the following language:

This document shall be effective as a waiver of restrictions on assessment and collection with respect to the taxable years ending December 31, 1965 and December 31, 1966 and the taxable period ending April 18, 1968 on the date the schedule of overassessments with respect to the taxable years ending December 31, 1964 and December 31, 1967 is signed by an authorized representative of the Internal Revenue Service.[7]

The qualified Form 870 included a number of features which were designed to allow time for the Joint Committee's approval of the overassessment, and upon approval and credit of the overpayments, P & R would pay the net deficiency of about $4 million.[8] The record indicates that at no point in this whole process did P & R ever intend to challenge the merits of the IRS' position in the Tax Court.[9]

After the Chicago office of the IRS received the qualified Form 870, a report on the audit was prepared for the Joint Committee. In January, 1973, P & R's files were forwarded to the National Office of the IRS for transmittal to the Joint Committee. As this process was occurring, IRS control documents were sent from the Chicago office of the IRS to the Kansas City Service Center with directions to process the case.[10]

In February of 1973, Ida Ballard, an employee at the Kansas City Service Center, began assessment procedures for the deficiencies for the years 1966 and 1968. Ms. Ballard was unaware of any instructions directing that assessments not be made.[11] P & R's internal tax counsel, Gerald Nordstrom, immediately contacted the Kansas City Service Center after receiving a bill for these deficiencies. Nordstrom explained the situation to Ballard, and soon thereafter the IRS abated these assessments. Nordstrom received notices of abatement from the IRS.

The communications problems between the Chicago office of the IRS and the Kansas City Service Center continued into May of 1973, when the case was still under review by the Joint Committee. P & R had earlier consented to an extension of the statute of limitations to June 30, 1973. The Chicago office, which had responsibility to monitor the statute of limitations, obtained a further extension from P & R to September 30, 1973. Unfortunately, the Chicago office did not relay this information to the Kansas City Service Center, leaving Ms. Ballard to believe that the statute of limitations on the assessments would run on June 30, 1973.[12] Accordingly, on June 22, 1973, Ballard initiated assessment for all of P & R's deficiency years (1965, 1966, and the tax period ending April 16, 1968).

P & R received the bills for these second assessments on June 25, 1973. Nordstrom again contacted Ballard and discussed the situation with her. He explained that the assessments were premature because the conditions of the qualified Form 870 had not yet been met, and in addition, P & R had consented to an extension of the statute of limitations to September 30, 1973.[13]

7. A copy of this form appears at SR 46 and Appendix B of P & R's Opening Brief.

8. The qualified Form 870 document itself was executed only by P & R, and this agreement did not bind the IRS in any way. Execution of this document did not extend the statutory period of limitations for refund, assessment, or collection of the tax.

9. *See* SR 5, 360, 366, 419–420, and 1549–50.

10. An IRS service center actually processes deficiencies and overassessments, and it also initiates collections and refunds. When a Service Center receives *control cards noting a deficiency* of over $50,000, the deficiency is automatically assessed unless there are special instructions otherwise.

11. When the assessments occurred, the IRS did not send P & R a ninety-day notice. The Joint Committee at the time was still reviewing the *overpayments.*

12. *See* Deposition of Ballard at SR 266–67.

13. Nordstrom mailed Ballard a letter dated June 28, 1973 confirming the substance of his conversation with her and enclosing copies of the consents relative to the statute of limitations. *See* SR 26–27; Exhibit 23, SR 107.

Unbeknownst to either at the time, the P & R overpayments cleared the Joint Committee on June 19, 1973. The Kansas City Service Center did not learn of the Joint Committee's action until June 26, 1973. Nordstrom received word of the Joint Committee's approval by letter from the Chicago District Director of the IRS dated June 26, 1973.

The IRS never abated the June 22, 1973 assessments even though they occurred before the Kansas City Service Center had scheduled the overpayments. The actual time sequence for scheduling of the overpayments was the following: (1) The schedules for the overassessment for the 1967 tax year ($6,237,660) were signed and credited to P & R in August of 1973; and (2) the schedules for the overassessment for the 1964 tax year ($231,991) were not signed and credited to P & R until October of 1973. Thus, the second scheduling of overpayments did not happen until after the statute of limitations had expired on September 30, 1973.

Proceeding on the basis of the June 22, 1973, assessments, the IRS commenced collection action against P & R in November of 1973. P & R objected by asserting that this action was illegal because the conditions of the qualified Form 870 had not been satisfied. The IRS nonetheless demanded immediate payment of the deficiencies plus interest.

On December 18, 1973, P & R filed suit in the United States District Court for the Northern District of Illinois in Chicago to enjoin the IRS from collecting or otherwise enforcing the $10,529,835 of assessed tax deficiencies. After both parties had moved for summary judgment, the district court, by memorandum order of August 29, 1980, held that the conditions of the qualified Form 870 had not been met at the time of the June 22, 1973 assessments. Applying principles of equity in the injunction proceeding before it, however, the court determined that P & R had not demonstrated irreparable harm. The court enjoined the IRS from collecting any amount in excess of the $4,060,184 net deficiency, plus applicable interest.[14]

Both parties appealed the district court's decision to the Seventh Circuit. The Seventh Circuit held the assessments invalid for failure to comply with the conditions of the qualified Form 870, but nonetheless affirmed the scope of the district court's injunctive relief. *Philadelphia & Reading Corp. v. Beck*, 676 F.2d 1159 (7th Cir.1982). This decision permitted the IRS to collect the $4,060,184 sum.[15]

On April 6, 1983, P & R filed separate claims with the IRS for refund for the taxable years ending December 31, 1966 ($9,336,231) and April 18, 1968 ($1,174,119). The IRS rejected these claims on November 8, 1973. P & R then filed suit in this Court on November 22, 1973. The Court dismissed this action without prejudice upon joint stipulation of the parties to provide an opportunity to resolve the statutory penalty issue. The case was reinstated on March 7, 1989. On March 28, 1989, P & R filed its amended complaint.

## II. SUMMARY JUDGMENT STANDARD

The parties have submitted a stipulated record to the Court. There are no material facts in dispute, and therefore, this case is appropriate for disposition in accordance with F.R.C.P. 56(c).

## III. DISCUSSION

The resolution of this controversy, regardless of its apparent complex factual context, presents this Court with distinct alternatives. First, as plaintiff urges, the Court can follow the reasoning of *Parsons Corp. v. United States*, 659 F.Supp. 48 (C.D.Cal.), *aff'd*, 835 F.2d 1435 (9th Cir. 1987), and permit P & R to recover the entire amount of its demand for refund ($10,529,835) plus interest. Alternatively, the Court could rely upon certain language in the Seventh Circuit's opinion and dismiss

---

**14.** The Court issued its final injunctive order on February 26, 1981.

**15.** The IRS collected the $4 million sum plus interest. The IRS also collected statutory penalties, but later refunded them to P & R.

the present suit.[16] After careful consideration of the circumstances, the Court holds that P & R's refund suit must be dismissed.

Plaintiff P & R relies heavily on the *Parsons* decision. The Court must concede that *Parsons* is similar to the present situation, with subtle but important distinctions. In *Parsons*, the IRS carried out an audit of multiple tax periods, and declared refunds for certain years and deficiencies for others. Like P & R in the present case, the taxpayer in *Parsons* executed a qualified Form 870. The Joint Committee cleared the refunds in *Parsons* as well. The IRS assessed the deficiencies before it had authorized the overpayments.[17] When the IRS actually scheduled the overpayments, however, the statute of limitations on the assessments had run. The taxpayer filed claims for refund of the deficiencies on the basis that the assessments were null and void.

The district court concluded that "[b]ecause the condition here had not been met at the time of the June 27 assessment, no valid waiver of Parsons' rights was in effect; therefore, the assessment was made in contravention of § 6213(a)." *Par-*

*sons,* 659 F.Supp. at 51. The IRS had made arguments based on analogy to the law of contracts, as it has done in this case, but the district court rejected them. *Id.* at 52. The district court held that Parsons was entitled to a full refund. *Id.*[18]

There are critical distinctions between the present case and *Parsons,* however, that lead this Court to discount the applicability of the *Parsons* holding. Specifically, the district court in *Parsons* noted that "[t]here is no evidence that Parsons ever admitted that it owed the deficiency and no evidence that it would not have disputed the deficiency on the merits before the Tax Court in 1975, had the government properly issued Parsons the 90–day deficiency notice." *Parsons,* 659 F.Supp. at 51. Consequently, the court in *Parsons* found it essential to protect the taxpayer's right to proceed in the Tax Court before having to pay a tax deficiency:

> The whole purpose of the restrictions on assessments and collections in § 6213(a) 'is to give the taxpayer an opportunity to challenge in the Tax Court an alleged deficiency before he has to pay it.' *De-Welles v. United States,* 378 F.2d 37, 38 (9th Cir.), *cert. denied,* 389 U.S. 996, 88

16. The Seventh Circuit was keenly aware of the remedy that P & R would pursue, and added the following discussion to its opinion:

> Nevertheless, to protect the Government from any unjust refund suit the taxpayer might file after paying the net deficiency plus interest, we hold that collateral estoppel may not be asserted against the Government with respect to the deficiencies. After filing this lawsuit the taxpayer indeed filed claims for refund of the very overpayments at issue here and if collateral estoppel were applied, the taxpayer might actually recover the overpayments formerly offset by the deficiencies. By its election to sue for a refund, however, the taxpayer has chosen to accept the benefits of the Form 870 agreement. It cannot simultaneously argue that the settlement embodied therein is null and void. If we adopted the taxpayer's position and forbade the Government to collect the entire June 22, 1973, assessments of $14 million and if collateral estoppel applied, even though the taxpayer had previously admitted it owed the Government a net deficiency, the taxpayer could be receiving back from the Government $6 million, for a total $10 million windfall (no payment of $4 million net deficiency plus $6 million recovery of overpayments). Similarly, given the

district court's injunction of all but the $4,060,184 net deficiency, if collateral estoppel applied, the taxpayer could be receiving a $6 million windfall (recovery of the overpayments). The taxpayer cannot have its cake and eat it too.

*Philadelphia & Reading Corp. v. Beck,* 676 F.2d 1159, 1164 (7th Cir.1982). The Seventh Circuit added this discussion after it had ruled that the June 22, 1973 assessments were premature and invalid. *Id.* (citing *Steiner v. Nelson,* 259 F.2d 853 (7th Cir.1958) and *United States v. Yellow Cab Co.,* 90 F.2d 699 (7th Cir.1937)).

17. The IRS collected the deficiencies by initially applying the overassessments from the first audit and then applying an overpayment by the taxpayer in another year outside of the audit. In the present case, the IRS collected the assessed deficiencies by first applying the overassessments from the audit, and then by obtaining a direct payment by P & R of the remaining sum at the termination of the injunction litigation.

18. The Ninth Circuit Court of Appeals affirmed this decision in an unpublished opinion. *Parsons Corp. v. United States,* No. 87–5730, slip op. [835 F.2d 1435 (table)] (9th Cir.1987).

S.Ct. 501, 19 L.Ed.2d 494 (1967). Even if one adopts the reasoning in *Lyddon & Co.* [*v. United States*, 158 F.Supp. 951, 141 Ct.Cl. 545 (1958)] that a taxpayer who admits that he owes the deficiency has no desire to contest it in Tax Court, one cannot apply the reasoning to Parsons, who made no such admission and did not receive a fair opportunity to litigate the merits of the deficiency in the Tax Court before it had to pay the tax.

*Parsons*, 659 F.Supp. at 51–52. Furthermore, the district court expressly distinguished the situation in *Philadelphia & Reading v. Beck:*

> *Philadelphia & Reading Corp.*, 676 F.2d 1159, is distinguishable from the case at hand on the same basis. In that case, the taxpayer's inside counsel testified that he had conditionally agreed to the deficiency at the conclusion of the IRS examination and that it was the taxpayer's intent at that time to pay the deficiency plus interest. *Id.* at 1161.

*Parsons*, 659 F.Supp. at 52, n. 7.

Unlike *Parsons*, the safeguarding of P & R's right to proceed in the Tax Court before payment of the deficiencies has diminished significance in the present case because at no point did P & R ever intend to utilize this procedure.[19] In addition, although the IRS did not fulfill the condition of the qualified Form 870,[20] P & R still received all the substantive benefits from this agreement that it had expected. The IRS ultimately credited P & R with the overpayments and remained content with only payment of the net deficiency.[21] It is apparent, therefore, that the IRS' failure to comply with the letter of the qualified Form 870 did not prejudice the taxpayer in a material way. The record indicates that the IRS did all it could to accommodate the taxpayer at the conclusion of the audit. Accordingly, it would be an unjust windfall for P & R to recover any amount of the $10.5 million in deficiencies when it has already obtained the benefits of the IRS' credit of $6.5 million in overpayments without suffering any material detriment. The result that P & R desires would be totally unconscionable.

P & R has reaped the benefits of the qualified Form 870 by having the overpayments credited against the deficiencies; its expectations were fulfilled. The record shows that P & R had no intention of challenging the IRS' position in the Tax Court. The factors that persuaded the court in *Parsons* to reach the result that it did are not compelling in this case. Consequently, it is appropriate to consider the contentions that P & R experienced no material prejudice from the IRS' action and P & R obtained the substantive results from the qualified Form 870 that it had expected. Because it enjoyed the benefit of its bargain, P & R is not entitled to a refund of any amount of the tax deficiencies.[22]

## IV. CONCLUSION

In rendering its decision, the Court has carefully considered all arguments that the parties have presented. The Court has decided that P & R has no right to a refund of any amount of the deficiencies. P & R's suit shall be dismissed.

Plaintiff's motion for summary judgment is denied. Defendant's motion for summa-

---

**19.** *See supra* note 9. The Seventh Circuit also observed that the "audit schedule was agreed to conditionally by the taxpayer's inside tax counsel, who testified that it was the taxpayer's intention to pay the net deficiency plus interest." *Philadelphia & Reading Corp. v. Beck*, 676 F.2d 1159, 1161 (7th Cir.1982).

**20.** *See Philadelphia & Reading Corp. v. Beck*, 676 F.2d 1159, 1164 (7th Cir.1982).

**21.** The IRS credited the overassessment for the 1967 tax year in August, 1973, and the overassessment for the 1964 tax year in October, 1973.

**22.** It is not necessary for the Court to decide whether the June 22, 1973 assessments were "void" or merely "voidable." The Seventh Circuit has already held that they were void, and collateral estoppel bars further litigation of this point. The United States has presented extensive briefing on this issue, but has totally neglected to address or realize the operation of collateral estoppel. Regardless of the Seventh Circuit's holding, the Court deems it proper to dismiss the present suit.

ry judgment is granted. An order shall issue in accordance with this opinion.